1                          Hirsch

2    check.

3         Q.    Am I understanding you correctly

4    that the post has a website and you're able

5    to log into it and review statements that

6    reflect the payments they're making to you

7    for your photographs, you approve those

8    statements, and then they wire you the

9    money or they pay you electronically?

10        A.    Almost.  The only thing different

11   is they don't own the website.  It's an

12   independent firm.

13        Q.    OK, that's a good clarification.

14             What's the name of that firm?

15        A.    It's -- I think it is called

16   Tungsten, referred to as Tungsten.  I think

17   it is an English firm if I am not mistaken.

18   I guess it does invoicing.

19        Q.    If I were to log into that system

20   today, would you be able to see all of the

21   statements going into the past?

22        A.    I'm not sure.  Possibly.

23        Q.    Do you download those statements?

24        A.    Well, every Thursday, there is a

25   new statement, if you worked the previous

1                    Hirsch

2    week, that's available, and then you, as I

3    said, fill it out, OK it, look at the dates

4    and the amounts, things like that, make

5    checkmarks, go through about a five-step

6    process to do that, and then submit it and

7    then you get an e-mail receipt, and then

8    the money is deposited in your account

9    directly I believe by Dow Jones.

10        Q.    When you say an e-mail receipt,

11    what do those e-mails look like?

12        A.    I guess the e-mail says that you

13    have submitted the invoice.

14        Q.    Does it say how much you have

15    been paid and name the photograph at issue?

16        A.    No, it doesn't name photographs,

17    no.

18        Q.    Which account do you receive

19    those e-mails at?

20        A.    Probably SH@StevenHirsch.com.

21        Q.    And is it correct that at least

22    one of those e-mails would have reflected

23    the transaction related to this photo

24    that's at issue in the case?

25        A.    Well, one of their transactions

1                          Hirsch
2     would have.  But it wouldn't -- it wouldn't
3     specifically state that assignment.  It
4     only states that you worked that day.
5          Q.    OK.  And that would have
6     generated an e-mail that would have been
7     sent to your @StevenHirsch.com account?
8          A.    It that they are -- that they
9     have -- I'm sorry, that you have filled out
10    that invoice, yeah.  It's just a receipt
11    that they have it.
12         Q.    That would have been delivered to
13    you by e-mail?
14         A.    Yes.
15         Q.    Do you have that e-mail?
16         A.    I don't know.  I would have to
17    check.
18         Q.    You haven't looked for it?
19         A.    No.  Because again, those e-mails
20    don't state and I assume that Richard
21    didn't ask me for that for that reason
22    because they don't state the specific job
23    that you have done or photographs that you
24    have submitted for payment.
25         Q.    And that's the account that you

1                        Hirsch

2     wiped clean about a year ago, is that

3     right?

4          A.    Yes.

5          Q.    So that would have been --

6          A.    I'm not sure if that's the

7     account where I get it.  I mean, I could

8     look at all of this right now and tell you

9     right now if that is where I get it.

10         Q.    No, just trying to get your

11    understanding as you sit here in the room.

12         A.    Um-hm.  It goes to some account.

13         Q.    So you said they make payments to

14    you through Dow Jones in an electronic

15    manner, correct?

16         A.    Um-hm.

17         Q.    Are those reflected in your bank

18    account statements?

19         A.    Yes.

20         Q.    Who do you bank with?

21         A.    Chase.

22         Q.    Do you have your bank account

23    statements from February of 2016 to today?

24         A.    I don't collect them.  I mean,

25    are they available from Chase?  I believe

1                          Hirsch

2    so.

3         Q.    You haven't looked for them to

4    produce them in this case?

5         A.    No.

6         Q.    Does -- we have been talking kind

7    of about the daily process by which you

8    bill the Post.  Do you have a written

9    contract with them that basically lays out

10   the understanding between you and them with

11   regard to the photos that you're going to

12   deliver to them?

13        A.    I signed a contract in the past.

14        Q.    When did you sign?

15        A.    I don't know.  Years ago.

16        Q.    You said you had been working

17   with them since the '90s, is that right?

18        A.    Yes.

19        Q.    Was it all the way back at the

20   beginning of the relationship?

21        A.    What is that?

22        Q.    Signing of the contract?

23        A.    No, there was multiple contracts.

24        Q.    Do you have copies of them?

25        A.    No, not available now.

1                              Hirsch
2        Q.    Have you looked for them?
3        A.    No.  I don't -- I don't really
4     catalog things very well.
5        Q.    Have you asked the Post for
6     copies of the contract since this lawsuit
7     began?
8        A.    No.
9        Q.    Do you believe they would give
10    them to you if you asked for them?
11       A.    I don't know.
12       Q.    You said earlier today that they
13    were pretty forthcoming with copies of
14    documents, correct?
15       A.    Photographs.
16       Q.    Right.  But you don't think they
17    would give you copies of the contracts that
18    you signed if you asked for them?
19       A.    I don't know.
20       Q.    When was the last time you
21    remember signing a contract?
22       A.    Years ago.
23       Q.    How many years?
24       A.    I can't even remember.
25       Q.    More than five?

Page 77

1                              Hirsch
2          A.    I -- probably.
3          Q.    OK.  In the contracts that you
4     have signed, are there provisions related
5     to who will own the rights to the
6     photographs --
7          A.    Yes.
8          Q.    -- after you deliver them?
9          A.    Um-hm.
10         Q.    What do those provisions say?
11         A.    That we own all rights.
12         Q.    When you say we, do you mean
13    yourself?
14         A.    Yes.
15         Q.    Do they have an exclusive license
16    period for any period of time, the Post,
17    once you deliver a photograph to them?
18         A.    I believe they can use a picture
19    indefinitely.
20         Q.    When I say exclusive license, I
21    mean, are you allowed to license the
22    photograph to other people besides the Post
23    after they've decided they want to use one
24    of your photos?
25         A.    Yes.

Page 78

1                          Hirsch

2          Q.    And that's an unlimited right;

3    there is no period of time in which you

4    cannot license to people other than the

5    Post?

6          A.    The period of time I believe is

7    until 4 o'clock the next day.

8          Q.    They have an exclusive license

9    for essentially one day?

10         A.    Yes.

11         Q.    After that, you're allowed to

12   license it to whoever you want to?

13         A.    Yes.

14         Q.    And you don't have a copy of that

15   document?

16         A.    No.

17         Q.    That's just from your

18   recollection?

19         A.    Yes.  They are very unusual in

20   the way that they allow people to use or

21   own their own photographs.

22         Q.    Are you aware that at a

23   conference with the court a couple of weeks

24   ago, the judge sanctioned Mr. Leibowitz's

25   firm and ordered them to pay us 2000

```
 1                          Hirsch
 2    dollars because you did not comply with
 3    your discovery obligations?
 4        A.    Do I know that?
 5        Q.    Are you aware of that?
 6        A.    No.
 7        Q.    Are you aware that your lawyers
 8    tried to voluntarily dismiss your case last
 9    week?
10            MR. LIEBOWITZ:  Objection.
11            MR. WILLIAMS:  What's the
12        objection?
13            MR. LIEBOWITZ:  What?
14            MR. WILLIAMS:  What's the
15        objection?
16            MR. LIEBOWITZ:  Relevance.
17            MR. WILLIAMS:  It is not a
18        deposition objection.  OK, go ahead.
19        A.    Could you repeat the question.
20        Q.    Are you aware that your attorneys
21    tried to voluntarily dismiss your case last
22    week?
23        A.    No.
24        Q.    You did not know before I just
25    said that that last week, your attorneys
```

Page 80

1                          Hirsch

2      tried to voluntarily dismiss this lawsuit

3      that we are sitting here today talking

4      about?

5              MR. LIEBOWITZ:  Objection, asked

6         and answered.

7         A.    No.

8         Q.    Are you aware that my client made

9      an offer to settle this case last Friday?

10        A.    He talked about possible

11     settlement.

12        Q.    Are you aware that if you lose

13     this case, the judge could order you to pay

14     all of my clients' attorney's fees?

15             MR. LIEBOWITZ:  Objection.

16        A.    Am I aware of that?

17        Q.    Yes.

18        A.    No.

19        Q.    You didn't know that?

20        A.    No.

21        Q.    Is it correct that you basically

22     learned of the use of the photograph at

23     issue on the Frisky.com the day that they

24     used the photograph in February of 2016?

25        A.    Did I learn about it that day?

1                          Hirsch

2        Q.    Yes, sir.

3        A.    No.

4        Q.    When did you learn about it?

5        A.    I'm not sure of the date.

6        Q.    Was it close in time to the use?

7        A.    I couldn't say for sure.

8        Q.    How did you discover the use of

9    the photograph on Frisky.com?

10       A.    Since I've been working with

11   Mr. Leibowitz, I've been looking for

12   infringements.  He has been looking for

13   infringements.  So I'm not sure how this

14   was discovered because there has been a lot

15   of infringements discovered.

16       Q.    You don't recall whether you

17   discovered this particular use or whether

18   the law firm discovered it?

19       A.    No, I don't.

20       Q.    Why did you wait from February of

21   2016 to September of 2016 to file the

22   lawsuit?

23       A.    Can you repeat that one more

24   time.

25       Q.    Sure, the use at issue was

Page 82

1                           Hirsch

2    February of 2016.  You filed this lawsuit

3    September of 2016.  Why did you wait all

4    those months to file the lawsuit?

5         A.    Well, there are a lot of images

6    of mine that are published and it takes a

7    bit of due diligence to try to find them.

8    Possibly it wasn't found until then.

9         Q.    We will look at the responses to

10   the first set of Interrogatories that we

11   marked as an exhibit earlier today.  It

12   should be there.  One of the first exhibits

13   that we marked.

14            If you take a look at response to

15   number 5, please.  It's on page 2.

16        A.    Yes.

17        Q.    It says February of 2016, it is

18   the date on which you became aware of the

19   display on the Frisky.com?

20        A.    Um-hm.

21        Q.    When you signed these

22   interrogatory responses correct?

23        A.    Um-hm.

24        Q.    So why did you wait from February

25   to September to file the lawsuit?

```
1                      Hirsch
2      A.    I -- I have my lawyer filing
3  lawsuits, so I'm not sure why he does -- or
4  why he files them when he does.
5           MR. WILLIAMS:  I am going to take
6      a quick break to get my next exhibits
7      ready.
8           THE VIDEOGRAPHER:  The time is
9      11:56 a.m.  We are off the record.
10          (Exhibit 12, document Bates
11      stamped SH1 through SH8 marked for
12      identification, as of this date.)
13          (Exhibit 13, three-page document
14      entitled, "The World's Leading
15      Celebrity News Agency" marked for
16      identification, as of this date.)
17          (Exhibit 14, two-page document
18      entitled, "Certificate of Registration"
19      marked for identification, as of this
20      date.)
21          THE VIDEOGRAPHER:  The time is
22      12:03 p.m.  We are back on the record.
23      Q.    Mr. Hirsch, we have marked as
24  Exhibit 12 a collection of documents
25  produced to us in the case Bates numbered
```

Page 84

1                          Hirsch
2      SH1 through SH8.  Just let me know if you
3      recognize these after you have taken a look
4      at them, please.
5          A.    Um-hm.  Yes, I do.
6          Q.    What are these documents?
7          A.    These are the -- I guess the
8      purchase orders that I was talking about
9      before on the top, the Tungsten purchase
10     orders that I was talking about.
11         Q.    So the first two pages relate to
12     photographs that you were paid by the New
13     York Post for use of, is that correct?
14         A.    Well, days that I worked for
15     them, not photographs per se.
16         Q.    So the amounts here reflect
17     monies they're paying you for your time as
18     opposed to a license for the photograph, is
19     that right?
20         A.    Well, they're paying me for the
21     time and the requirements are to give them
22     photographs.  Yeah.
23         Q.    So the amounts paid cover both
24     the time you spent going down to the
25     courthouse and also their right to use the

Page 85

1                              Hirsch
2      photograph in the paper?
3          A.    That's correct.
4          Q.    If you flip to the third page,
5      please.  What is this document?
6          A.    This is a reproduction of sales
7      that were made through a photo agency
8      called Splash, and they show payments made
9      for photographs.
10         Q.    And this one on page 1 says it is
11     a royalty statement for December 2015.  Is
12     that correct?
13         A.    That's correct.
14         Q.    Have you received any such
15     statements since December of 2015?
16         A.    Yes.
17         Q.    Do you still have those
18     statements?
19         A.    Possibly.  Or probably, yes.
20         Q.    Have you looked for them to
21     produce them in this case?
22         A.    Well, I wasn't asked to produce
23     all of them.  I was asked to produce some
24     and this is one of them.
25         Q.    Well, this is the only one you

1                        Hirsch

2    have produced.  So -- but you believe that

3    you have others?

4        A.    Yes.

5        Q.    Why did you produce one from

6    December of 2015?

7        A.    Probably the first one I found.

8        Q.    Do you receive these by e-mail?

9        A.    Yes.

10        Q.    Which of your accounts do you

11    receive from that?

12        A.    I don't know.

13        Q.    You don't know whether it's the

14    me.com, the G-Mail account?

15        A.    No.

16        Q.    The Steven Hirsch?

17        A.    Not the G-Mail.  I don't receive

18    much of anything from G-Mail accounts.

19        Q.    It could be the StevenHirsch.com

20    or me.com account?

21        A.    Probably Steven Hirsch.

22        Q.    That's the one you wiped clean

23    about a year ago?

24        A.    Yeah.  They -- actually, looking

25    I think -- it could have been a year and a

1                          Hirsch

2     half ago, if this is still there.  I'm not

3     sure.

4          Q.    So you believe that you still

5     have this in your e-mail account?

6          A.    This particular one?

7          Q.    Correct?

8          A.    Probably, yeah, it is probably

9     put together recently.

10         Q.    So if you look at the document,

11    the first instance is millionaire Robert

12    Durst arrested in L.A. writer's slaying and

13    says December 23, 2013, good morning

14    America.

15              So is this a payment you received

16    for use of your photograph on that

17    television show?

18         A.    It's a payment that I have

19    received and given me a percentage of.

20         Q.

21

22

23         A.

24

25         Q.    I see.  And if you go to the next

```
 1                      Hirsch
 2   one down, Amanda Bynes appears in court in
 3   NYC.  She is a celebrity?
 4        A.    Um-hm, yes.
 5        Q.    And you took this picture of her
 6   in the courthouse?
 7        A.    Yes.
 8        Q.    It says here Corbis subagent,
 9   Serbia.  What does that mean?
10        A.    It means that there is an agent
11   in Serbia that is probably a subagent of
12   Corbis that sold the photograph.
13        Q.    At this time, December 2015,
14   Corbis owned Splash, is that correct?
15        A.    Yes.  I believe so.
16        Q.    And Corbis is a licensing
17   clearinghouse, is that correct?
18        A.    I'm not sure what a licensing
19   clearinghouse means.
20        Q.    Essentially they offer bulk
21   licensing to websites and other users of
22   photographs, correct?
23        A.    Bulk or individual.
24        Q.    Do you have a contract with
25   Splash?
```

```
 1                          Hirsch
 2        A.    I don't believe so.
 3        Q.    You never entered a written
 4   agreement with them of any kind?
 5        A.    I think there was an agreement
 6   where you could upload pictures that you
 7   would sign or check.
 8        Q.    So you basically agreed to the
 9   contract, it was presented to you at the
10   time that you went through the online
11   process of registering to allow Splash to
12   license your photographs?
13        A.    While you were uploading them,
14   yes.  If that's what you are asking.
15        Q.    Are you saying you click through
16   the agreement every time you upload a new
17   photograph?
18        A.    I believe so.
19        Q.    Have you ever downloaded copies
20   of those agreements?
21        A.    No.
22        Q.    Do you receive them by e-mail?
23        A.    No.
24        Q.    At this time, do you have an
25   account with Splash such that you can log
```

Page 90

1                          Hirsch
2     in to your account and view the uses they
3     have made of your photographs?
4          A.    Yes.
5          Q.    And have you done that to produce
6     any documents in this lawsuit?
7          A.    No.
8          Q.    Did you submit the Kiehm
9     photograph at issue in this case to Splash?
10         A.    I don't believe so.
11         Q.    You're not sure?
12         A.    I would say I probably didn't.
13    But I'm not 100 percent sure, no.
14         Q.    Well, how do you know that my
15    client didn't have a license to use the
16    photograph if you're not even sure whether
17    you submitted it to Splash which is in the
18    business of issuing licenses to websites to
19    use photographs?
20         A.    How do I know?
21         Q.    Correct.
22         A.    I would imagine your client would
23    have to produce the contract that they
24    purchased it.
25         Q.    But you don't know yourself

Page 91

1                        Hirsch

2     whether you submitted the photograph to

3     Splash in such a way that my client could

4     have a license to use the photograph?

5          A.    No.

6          Q.    Do you submit photographs to

7     Getty?

8          A.    No.

9          Q.    Are there any licensing companies

10    other than Splash that you use or submit

11    photographs to?

12         A.    No.

13         Q.    We have marked earlier as Exhibit

14    13 a copy of the Splash website.  I'm just

15    going to show it to you for the record.

16         A.    This one?  Yeah, um-hm.

17         Q.    So if you flip over to the second

18    page, there is a "For Contributors, contact

19    Splash to become one of our valued

20    photographers and videographers," and there

21    is a sign up.

22         A.    Um-hm.

23         Q.    The process you referred to

24    earlier where you submitted photos to them

25    and created an account, did you use this

Page 92

1                              Hirsch

2        online process through their website?

3             A.     No.

4             Q.     How did you go about doing it?

5             A.     I've been with Splash many years.

6        I signed up many years ago.  I don't know

7        how I was signed up.

8             Q.     But you do regularly log in now

9        and submit photos to them, right?

10            A.     Today?

11            Q.     Not today specifically, but in

12       your ongoing business activities?

13            A.     Do I submit photographs to them?

14            Q.     Yes, sir.

15            A.     Sometimes.

16            Q.     Do you recall the last time that

17       you did that?

18            A.     No.

19            Q.     We have marked as Exhibit 14 a

20       copyright registration for the photo at

21       issue in this case.  You should have it in

22       front of you there.  The effective date in

23       the upper right hand is May 15, 2016.  And

24       below the date of first publication is

25       February 16, 2016.

1                          Hirsch

2    particular page.

3         Q.    I apologize for the confusion.

4    I'm talking about the photograph at issue

5    in this, our lawsuit?

6         A.    We are not looking at this any

7    longer?  You asked to pull this out.

8         Q.    Keep it in front of you, please,

9    but you can answer my question about the

10   photograph at issue in this case.

11        A.    OK.  What is the question again?

12        Q.    Are you aware that it was posted

13   to the NewYorkMag.com website?

14        A.    No.

15        Q.    This page, this Splash page

16   indicates that when your photos are posted

17   to that website, you get paid, is that

18   correct?

19        A.    Well, I get paid if Splash sells

20   them the photograph.

21        Q.    Right.  Were you aware on the

22   Frisky.com page where the photograph at

23   issue in this case was displayed, there was

24   a link back to the NewYorkMag.com website?

25        A.    Is that what's under the

1                    Hirsch

2    photograph?

3         Q.    Yes, sir.

4         A.    I can't see that because the

5    image is too small.  So I can't say that's

6    the case in here.

7         Q.    So in that instance, where

8    another website links back to New York Mag

9    and New York Mag has a license from Splash

10   to display the photograph, you get paid by

11   Splash for the use by New York Mag,

12   correct?

13        A.    In this case, I --

14        Q.    Right.

15        A.    Yes, but I don't see that here as

16   payment for that photograph.

17        Q.    Correct.  We don't have your

18   statement from Splash from February 2016.

19              If you could turn to the

20   interrogatory responses that we marked

21   earlier today, the first set.  Sorry for

22   jumping back and forth so many times.

23        A.    I don't know what paper that is.

24        Q.    And I'm actually directing you to

25   the wrong -- it is the second set that we

Page 104

1                          Hirsch

2        Q.    Are you aware of that actually

3    happening in this instance?

4        A.    Not in this instance, but I'm

5    aware that it happens in the industry.

6              MR. WILLIAMS:  OK.  I'm going to

7        take a break to see if I have any more

8        questions.

9              MR. LIEBOWITZ:  OK.

10             THE VIDEOGRAPHER:  The time is

11       12:30 p.m.  We are off the record.

12             (Recess)

13             THE VIDEOGRAPHER:  The time is

14       12:36 p.m. and we are back on the

15       record.

16             MR. WILLIAMS:  I don't have any

17       further questions today, Mr. Hirsch,

18       thank you for your time.

19   EXAMINATION BY

20   MR. LIEBOWITZ:

21       Q.    So for clarification purposes,

22    Steve, were you aware of the deposition

23    date of May 19?

24       A.    Yes.  I previously stated I

25    wasn't.  I had forgotten about it, but I

1                              Hirsch

2      remember that you did tell me and told me

3      could I reschedule.  And I told you I was

4      going away on that date and then you asked

5      me if I could reschedule.

6              MR. LIEBOWITZ:  All right.  No

7          further questions.

8      EXAMINATION BY

9      MR. WILLIAMS:

10         Q.    And I'm sorry, I'll just follow

11     up for a second.  When were you told of the

12     May 19 date?

13         A.    I believe a couple of weeks

14     before that.

15         Q.    And were you --

16         A.    I was confused when you were

17     asking me that question.  I was confusing

18     the initial date with the second date.

19         Q.    OK.  And when you say the initial

20     date and the second date, are you referring

21     to May 19 and today?

22         A.    No.  I was referring to the

23     initial date it was set up for.

24         Q.    Right.  May 19?

25         A.    May 19.  Yeah.

1                              Hirsch

2          Q.    So you --

3          A.    Because I knew I was going away.

4    So when he had told me that I guess the

5    week before, I said I was going away.

6          Q.    So the week before the May 19

7    deposition date, you were informed of it,

8    and you decided not to come to that

9    deposition because you were going to

10   travel?

11         A.    I had already had all the

12   arrangements made.

13         Q.    Were you informed that on May 15,

14   the court ordered you to appear on May 19

15   for that deposition?

16         A.    I -- as I said, I believe that

17   Richard told me the week before about it

18   and then I said, well, I had already made

19   all these arrangements.  And he told me

20   that he would reschedule the date.

21         Q.    But on May 15, I was in court --

22         A.    Right.

23         Q.    -- his colleague was with me, we

24   were in front of the judge, the judge said

25   on May 19, Steven Hirsch must be at his

Page 107

1                          Hirsch

2    deposition.  Were you informed of that

3    order from the court?

4        A.    Yes, Richard told me initially

5    about the first date.

6        Q.    That's not my question.  You said

7    you were told the week before.  This is May

8    15, the Monday before May 19.  Were you

9    told that the judge ordered you to be in

10   this office on May 19 for that deposition?

11       A.    Richard told me about a

12   deposition.  I'm -- yeah.  He told me about

13   a deposition.  I said I couldn't make it.

14   I was going away.

15       Q.    Did he tell you that the court

16   ordered you to be here?

17       A.    He didn't say the court ordered

18   me.  He said it was a deposition, can you

19   make that date, and I said that I was going

20   away, that I had already made arrangements.

21       Q.    So when you chose not to be here

22   on May 19, you were not aware that there

23   was an court order instructing you to be

24   here?

25       A.    As I said, I was out of town on

Page 108

1                      Hirsch

2     May 19, and the arrangements that I made

3     were before that.

4          Q.    It is a yes or no question, sir.

5     I'm sorry, you're trying to avoid it.

6                Give me the answer to the

7     question.  When you did not show up on May

8     19, were you aware that there was an order

9     from the court that you were supposed to be

10    here?

11         A.    It's not a yes or no answer.  I'm

12    not sure if that -- when Richard told me

13    that there was a deposition that it was

14    court ordered or not on that date.

15         Q.    But when he told you about it, it

16    was at least a week prior to May 19?

17         A.    I'm not sure if it was a week or

18    four days or three days.  I'm not sure.  It

19    was right before I had gone away.  It could

20    have been the day before.  It could have

21    been on the 15th.

22               MR. WILLIAMS:  OK, OK, I think

23         that is all I have.

24               MR. LIEBOWITZ:  OK, that's it.

25               THE WITNESS:  OK, thank you.

1                            Hirsch

2              THE VIDEOGRAPHER:  The time is

3      12:40 p.m.  This completes tape number

4      1s as well as the videotape deposition

5      of Steven Hirsch.

6

7                        _____

                         STEVEN HIRSCH

8

9      Subscribed and sworn to

10     before me this       day

11     of MO             , 2017.

12

13     _____

14

15

16

17

18

19

20

21

22

23

24

25